United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 11, 1997 Decided March 20, 1998

 No. 97-3072

 United States of America, 

 Appellee

 v.

 Sun-Diamond Growers of California, 

 Appellant

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 96cr00193-01)

 Eric W. Bloom argued the cause for appellant. With him 
on the briefs were Richard A. Hibey, Michael K. Atkinson 
and Charles B. Klein.

 Theodore S. Greenberg, Deputy Independent Counsel, ar-
gued the cause for appellee. With him on the briefs were 
Donald C. Smaltz, Independent Counsel, and Charles M. 
Kagay, Chief Appellate Counsel.


 Carter G. Phillips and Griffith L. Green were on the brief 
for amicus curiae American League of Lobbyists.

 Before: Williams, Henderson and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Williams.

 Williams, Circuit Judge: Sun-Diamond is a large agricul-
tural cooperative owned by individual member cooperatives 
including Diamond Walnut Growers, Sun-Maid Growers of 
California, Sunsweet Growers, Valley Fig Growers, and Ha-
zelnut Growers of Oregon. It came within the sights of an 
independent counsel, Donald C. Smaltz, who was responsible 
for investigating allegations of unlawful activity by former 
Secretary of Agriculture Mike Espy. The independent counsel 
charged Sun-Diamond with making illegal gifts to Espy, 
committing wire fraud, and making illegal campaign contribu-
tions.

 Linking Sun-Diamond and Espy was the figure of Richard 
Douglas. As Sun-Diamond's vice president for corporate 
affairs, Douglas was responsible for (among other things) 
representing the interests of the corporation and its member 
cooperatives in Washington. Given Sun-Diamond's business, 
the Department of Agriculture ("USDA") was naturally part 
of his bailiwick. According to performance evaluations signed 
by Sun-Diamond's president, Douglas was a diligent and able 
representative. He once described his approach to lobbying 
by paraphrasing Lord Palmerston: "We have no permanent 
friends or permanent enemies, only a permanent interest in 
Sun-Diamond Growers of California." Permanent friends 
aside, he had a long-time friend in Mike Espy--the two had 
gone to college together at Howard University and had 
stayed close in the years since.

 The crimes charged to Sun-Diamond grow out of two 
largely independent stories. One involves illegal gratuities 
given to Espy while he was Secretary of Agriculture, the 
other wire fraud and illegal contributions to the congressional 
campaign of the Secretary's brother, Henry Espy. We save 


the recitation of facts for the discussion of the distinct legal 
issues raised by each story.

 Sun-Diamond argues that under the facts alleged and 
proven it could not properly be found guilty of any of the 
offenses, and, as to the illegal gratuities, that the trial court's 
charge allowed the jury to convict on a theory precluded by 
the statute. We disagree with Sun-Diamond's claims of 
entitlement to dismissal of the indictment and to acquittal, 
but we agree that the jury charge on the gratuity counts was 
error and requires a remand for a new trial. Sun-Diamond 
also attacks the sentence, saying that the trial judge, having 
increased the offense level by eight for Espy's high-level 
status as required by the Guidelines, wrongly bumped it up 
another two levels on the theory that the Guidelines inade-
quately took that status into account. It also objects to the 
trial court's imposition of probationary conditions on Sun-
Diamond's member cooperatives, who were neither defen-
dants nor agents of the defendant. We agree with Sun-
Diamond on both sentencing points.

 

 * * *

 IllegalGratuities

 The key dispute here is over how close a link the govern-
ment must show between Sun-Diamond's gifts and official 
acts that the Secretary of Agriculture performed or might 
perform. The indictment detailed two specific issues on 
which Sun-Diamond had a clear interest in favorable action 
by the Secretary. The first was the market promotion pro-
gram ("MPP"), a grant fund administered by USDA and 
designed to prop up U.S. agricultural exports. See 7 U.S.C. 
s 5623. The Secretary of Agriculture was authorized to 
allocate MPP money to trade organizations like Sun- 
Diamond, who would in turn use it to defray overseas market-
ing expenses. According to the independent counsel, be-
tween 1990 and 1995 the Sun-Diamond member cooperatives 
received $23.9 million from MPP. In August 1993 Congress 


enacted budget legislation requiring the Secretary to give 
preference to "small-sized entities" in disbursing MPP funds. 
Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-
66, s 1302(b)(2)(A), 107 Stat. 312, 331 (1993). Sun-Diamond 
and its members were hardly mom-and-pop organizations--
they reported net sales of $648 million for fiscal year 1993--
but many of their constituent growers were quite modest in 
size. Sun-Diamond therefore wanted the Secretary to adopt 
a regulatory definition of "small-sized entities" that would 
include cooperatives such as its members.

 Sun-Diamond also took an interest in federal regulation of 
methyl bromide, a pesticide used by some of the growers who 
belonged to its member cooperatives. In late 1992 the Envi-
ronmental Protection Agency began review of a proposal to 
phase out the use of the chemical in the United States 
because of its potential to contribute to ozone depletion. 
Although the methyl bromide issue was not technically before 
USDA, a rational jury could conclude from the trial evidence 
that Sun-Diamond wanted Espy to help persuade EPA to 
delay or reject the proposed phase-out.

 Count I of the indictment charged the company with giving 
Espy (via Douglas) around $5,900 in illegal gratuities: tickets 
to the 1993 U.S. Open Tennis Tournament worth $2,295, 
luggage worth $2,427, meals worth $665, and a framed print 
and crystal bowl worth $524.1 The indictment further alleged 
that Sun-Diamond reimbursed Douglas for these outlays, 
treating them as business expenses.

 Sun-Diamond challenges Count I, asserting that the gratui-
ty statute, 18 U.S.C. s 201(c)(1)(A), requires the government 
to prove a nexus between each unauthorized gift and some 
specifically identified official act--performed or hoped to be 
performed--for which the gift was given. Because the indict-

__________
 1 Count II charged Sun-Diamond with paying $3,100 for Espy's 
girlfriend to accompany him to the International Nut Conference in 
Athens. The jury acquitted on this count.


ment failed to allege any such one-to-one relationship, con-
tends Sun-Diamond, the district court erred in denying its 
motion to dismiss Count I. See United States v. Sun-
Diamond Growers of California, 941 F. Supp. 1262 (D.D.C.
1996) (denying motion to dismiss); United States v. Sun-
Diamond Growers of California, 964 F. Supp. 486 (D.D.C.
1997) (denying renewed motion for acquittal). In a narrower 
variation on this argument, Sun-Diamond also challenges the 
jury instructions, saying that they impermissibly allowed the 
jury to convict if it found that Sun-Diamond gave Secretary 
Espy things of value merely in recognition of his official 
position, regardless of official acts that might have supplied 
the motivation. We reject Sun-Diamond's broader argument 
but agree with its challenge to the jury instructions, and it is 
with that challenge that we begin.

 The gratuity statute provides:

 Whoever ... otherwise than as provided by law for the 
 proper discharge of official duty ... directly or indirectly 
 gives, offers, or promises anything of value to any public 
 official, former public official, or person selected to be a 
 public official, for or because of any official act per-
 formed or to be performed by such public official, former 
 public official, or person selected to be a public official 
 ... shall be fined under this title or imprisoned for not 
 more than two years, or both.

18 U.S.C. s 201(c)(1)(A) (emphasis added).

 The statute defines an "official act" as "any decision or 
action on any question, matter, cause, suit, proceeding or 
controversy, which may at any time be pending, or which may 
by law be brought before any public official, in such official's 
official capacity, or in such official's place of trust or profit." 
18 U.S.C. s 201(a)(3).

 The trial court charged the jury in full accord with the 
independent counsel's theory that gifts motivated by an offi-
cial's status or position run afoul of the statute, regardless of 
whether the donor had any intent to affect or reward official 
conduct. Indeed, time and again the jury instructions ham-
mered home that theme:


 The gratuity statute makes it a crime for a person or 
 company to knowingly and willingly give a public official 
 a thing of value because of his official position whether 
 or not the giver or receiver intended that particular 
 official's acts be influenced. * * *

 

 The essence of the crime is the official's position of [sic] 
 as the receiver of the payment not whether the official 
 agrees to do anything in particular, that is, not whether 
 the official agrees to do any particular official act in 
 return. Therefore ... to prove that a gratuity offense 
 has been committed, it is not necessary to show that the 
 payment is intended for a particular matter then pending 
 before the official. It is sufficient if the motivating 
 factor for the payment is just to keep the official happy 
 or to create a better relationship in general with the 
 official. * * *

 

 It is sufficient if Sun-Diamond provided Espy with unau-
 thorized compensation simply because he held public 
 office. * * *

 

 In order for you to convict Sun-Diamond of violating the 
 gratuity statute, you must find beyond a reasonable 
 doubt that Sun-Diamond gave the gifts to Mr. Espy for 
 or because of Mr. Espy's official government position 
 and not solely for reasons of friendship or social purpose. 
* * *

 [T]he government must prove that Sun-Diamond Grow-
 ers of California, acting through its senior vice president 
 for corporate affairs, Richard Douglas, and knowingly 
 and willingly gave the gratuities, at least in part, because 
 of the Secretary's position in appreciation of Sun-Dia-
 mond Growers of California's relationship with him as a 
 public official or in anticipation of the continuation of 
 its relationship with him as a public official. The 
 government need not prove that the alleged gratuity was 
 linked to a specific or identifiable official act or any act 
 at all.

(Emphases added.)


 The language of the charge is far broader than that of the 
statute. To satisfy the criminal intent requirement embodied 
in the phrase "for or because of any official act," the giver 
must intend either to reward some past concrete official act 
or acts, or to enhance the likelihood of some future act or 
acts. This is the meaning we found in our most extensive 
discussion of the gratuity statute, United States v. Brewster, 
506 F.2d 62 (D.C. Cir. 1974). In addressing the claim that a 
violation of the gratuity statute is a lesser included offense 
subsumed within a violation of the bribery statute, now 
codified at s 201(b)(1)(A),2 we necessarily compared the two 
provisions, explaining that the bribery provision required a 
more exacting showing of intent. Id. at 71-74. We charac-
terized one aspect of the difference as follows:

 The bribery section makes necessary an explicit quid pro 
 quo which need not exist if only an illegal gratuity is 
 involved; the briber is the mover or producer of the 
 official act, but the official act for which the gratuity is 
 given might have been done without the gratuity, al-
 though the gratuity was produced because of the official 
 act.

Id. at 72 (emphasis added). As this passage makes tolerably 
clear, to say that the gratuity provision lacks a quid pro quo 

__________
 2 Section 201(b)(1)(A) imposes criminal penalties upon:

 Whoever ... directly or indirectly, corruptly gives, offers or 
 promises anything of value to any public official or person who 
 has been selected to be a public official, or offers or promises 
 any public official or any person who has been selected to be a 
 public official to give anything of value to any other person or 
 entity, with intent ... to influence any official act.

Because Brewster involved the acceptance rather than the giving of 
gratuities and bribes, the court in fact focused on 18 U.S.C. 
s 201(c)(1) (1969) (covering receipt of bribes, now codified with 
minor differences in language at s 201(b)(2)(A)), and 18 U.S.C. 
s 201(g) (1969) (covering receipt of gratuities, now codified with 
minor differences in language at s 201(c)(1)(B)). The elements of 
the offense at issue here are the same, however, regardless of 
whether the defendant is the donor or donee, so Brewster stands as 
a controlling precedent for our case.


requirement is not to read the "official act" language out of 
the statute. It is only to say that, in contrast to bribery, the 
gratuity and the official act need not each motivate the other. 
But the gratuity statute by its terms does still require at least 
a unidirectional relationship--the gift must be "for or because 
of" the act.

 The relation may be simply one of reward. "As the word 
'gratuity' implies, the intent most often associated with the 
offense is the intent to 'reward' an official for an act taken in 
the past or to be taken in the future." United States v. 
Sawyer, 85 F.3d 713, 730 (1st Cir. 1996) (construing virtually 
identical Massachusetts gratuity statute). Even in such a 
case, the giver presumably hopes that his gratuity will affect 
the recipient's future conduct--and this was undoubtedly the 
concern that motivated Congress to bring rewards for past 
acts within the coverage of the statute. But, in contrast to 
bribery, it is enough under the gratuity statute if the defen-
dant gives an unpromised benefit for a past governmental 
favor. And, whatever degree of intent to influence may be 
necessary for a bribe, a gift looking to future acts can be an 
unlawful gratuity where the giver is motivated simply by the 
desire to increase the likelihood of one or more specific, 
favorable acts. In summary, as we explained in Brewster, 
"under the gratuity section, 'otherwise than as provided by 
law ... for or because of any official act' carries the concept 
of the official act being done anyway, but the payment only 
being made because of a specifically identified act." 506 
F.2d at 82 (emphasis added).

 The independent counsel appears to accept this analysis of 
Brewster, but claims that in that decision we restricted appli-
cation of the official act requirement to cases involving elect-
ed officials or candidates for elective office. Indeed, Brew-
ster was a senator, and we noted that in cases involving 
elected officials the official act requirement served the impor-
tant function of distinguishing illegal gratuities from ordinary 
campaign contributions. See id. at 73 n.26, 81. But in a 
footnote we postponed the question of non-elected officials to 
another day, distinguishing and declining to express ultimate 


disagreement with United States v. Umans, 368 F.2d 725 (2d 
Cir. 1966), a decision that dispensed altogether with the 
intent requirement in a case involving gratuities offered to 
I.R.S. agents. Brewster, 506 at 73 n.26.

 Even assuming the footnote could be read as suggesting a 
readiness to jettison the intent requirement in cases involving 
appointed officials, we disappointed any such expectation 
eight years later by reaffirming the official act requirement in 
United States v. Campbell, 684 F.2d 141 (D.C. Cir. 1982). 
Campbell concerned a Superior Court judge who received 
free moving services from a trucking firm that he had treated 
remarkably lightly, issuing nominal or suspended sentences 
on over 1,000 traffic tickets. We approved a jury charge 
requiring "that the alleged gratuities be given and received 
'knowingly and willingly,' and 'for or because of an official 
act.' " Id. at 150 (emphasis added). To be sure, the attack in 
Campbell came from the defendants, who claimed a right to 
an even more restrictive charge. But Campbell cannot possi-
bly be said to have stripped the statute of its "for or because 
of" requirement.

 A detail from that case underscores how we have refused to 
allow the official act requirement to be satisfied by some 
vague hope of inducing warm feelings toward the donor. 
Campbell had served as Assistant Corporation Counsel for 
the District of Columbia before becoming a judge in 1973, and 
was reputed to have been "sympathetic to trucking interests" 
during that time. Id. at 149 n.13. Yet, responding to a 
somewhat unclear claim that the jury might have convicted 
for uncharged prior acts, we noted that "[i]t is not even clear 
which 'acts' of Robert Campbell could have been the basis for 
[the trucking company's] gratuities prior to 1973, because 
'sympathy to trucking interests' does not constitute an official 
act." Id. at 149 n.14.3 Here, too, if Douglas furnished Espy 
with gifts merely to win his generalized sympathy for Sun-

__________
 3 The independent counsel claims that these passages in Campbell 
turn on the notion that an Assistant Corporation Counsel is not in a 
position to perform official acts. The notion is false--under District 
law an Assistant Corporation Counsel may, for example, choose to 


Diamond, those gifts would not be illegal gratuities, unless 
the jury could find that Douglas sought this generalized 
sympathy to influence Espy to perform one or more official 
acts sometime in the future.

 At oral argument we questioned the representative of the 
independent counsel on the application of his theory to in-
stances where an old friend of some newly appointed office-
holder took him to a meal or sports event while his firm had 
matters pending before the officeholder. Counsel appeared 
to assert that this scenario fell within his view of the statute.4 
Indeed, it would have been squarely within the district court's 
charge to the jury. But we trust that, should Congress 

__________
prosecute (or not prosecute) traffic violations, D.C. Code ss 23-101, 
40-622. Perhaps because of its falsity, the notion is never men-
tioned by the Campbell court. Had the government charged Camp-
bell with a pre-1973 decision not to prosecute the trucking compa-
ny, rather than alleging mere "sympathy," such a decision might 
well have constituted an official act sufficient to support a gratuity 
charge.

 4 The colloquy at oral argument was as follows:

 THE COURT: So if an old friend of mine from law school 
 who's a partner in a firm that has a pending case before this 
 Court takes me to a baseball game, as we've done for years, 
 that's an illegal gratuity?

 COUNSEL: It may well be, yes.

 THE COURT: You're serious? 

 COUNSEL: If you have a case, if [counsel for Sun-Diamond] 
 takes you to the game tomorrow, takes you to the Redskins 
 game on Sunday while you have this case pending before you, 
 that's a gratuity.

Oral Arg. Tr. at 30-31. The independent counsel's theory here 
seems truly sweeping: if this hypothetical baseball arrangement 
has been in place "for years," stretching back to before the judge's 
investiture, it is difficult to see how it could be motivated by the 
judge's position. Even if the baseball invitation represented an 
increment in the donor's hospitality to his friend since the latter's 
appointment, under this circuit's reading of the statute it would 
violate s 201(c)(1)(A) only if offered, as the statute says, "for or 
because of any official act."


someday decide to criminalize such conduct, it will not require 
that the gifts be given "for or because of any official act."
 The independent counsel points to United States v. Secord, 
726 F. Supp. 845, 847 (D.D.C. 1989), as well as several 
decisions by other courts of appeals apparently holding that 
gifts motivated solely by the recipient's official position may 
be illegal gratuities. See United States v. Evans, 572 F.2d 
455, 480 (5th Cir. 1978); United States v. Standefer, 610 F.2d 
1076, 1080 (3d Cir. 1979) (en banc);5 Umans, 368 F.2d at 730; 
United States v. Bustamante, 45 F.3d 933, 940 (5th Cir. 1995); 
cf. United States v. Alessio, 528 F.2d 1079, 1082 (9th Cir. 
1976) (suggesting that donee's ability to use his position for 
donor's benefit was enough to satisfy the official act require-
ment). These decisions appear to leap from the gratuity 
statute's lack of a reciprocal quid pro quo requirement to an 
assumption that it has dispensed with any need to show intent 
focused on an official act or acts. Thus, the court in Busta-
mante says, "Generally, no proof of a quid pro quo is 
required; it is sufficient for the government to show that the 
defendant was given the gratuity simply because he held 
public office." 45 F.3d at 940. Any such leap disregards the 
explicit language of the statute and contradicts Brewster and 
Campbell. Other out-of-circuit cases seem to take the official 
act requirement more seriously. See, e.g., United States v. 
Muldoon, 931 F.2d 282, 287 (4th Cir. 1991) ("an illegal 
gratuity is a payment made for an act by the recipient that 
might have been done without any payment") (citing Brew-
ster ); cf. Sawyer, 85 F.3d at 735-36 (construing virtually 
identical Massachusetts gratuity statute).
 Finally, the independent counsel asserts that in United 
States v. Baird, 29 F.3d 647 (D.C. Cir. 1994), we embraced his 
broad interpretation of the gratuity statute. The question in 
Baird was whether the conflict of interest statute, 18 U.S.C. 
s 203(a), requires the government to prove that a defendant 
knew the statute covered him. We held that the clause 
"otherwise than as provided by law," which appears both in 
_____________
 5The independent counsel's brief made no mention of Standefer, but in a petition for reharing he notes that the Supreme
Court, in affirming the judgment on other grounds, Standefer v. United States, 447 U.S. 10 (1980), said in a footnote that "the
instructions to the jury on criminal intent" were "correct." Id. at 14 n. 8. Standefer's briefs in the Supreme Court and the Third
Circuit's unpublished panel opinion, United States v. Standefer, 1979 WL 4863 (3d Cir. 1979), however, make clear the defendant's
challenge was to the absence of a quid pro quo requirement, and to the trial court's refusal to instruct the jury that the defendant's
gifts to an I.R.S. agent had not in fact resulted in the favorable audit sought by the donor. Id.at *4-8. In any event, tahe instructions
in Standefer, reprinted in relevant part in the Third Circuit's panel opinion, id. at *5, *6, were far narrower than the charge in this
case, repeatedly emphasizing the requirement that the gifts be given for or because of tax audits performed by the donee.


s 203(a) and in s 201(c) (then codified at ss 201(f) and (g)), 
did not embody such a scienter requirement; rather, it 
merely required a showing that the public official received 
money to which he was not lawfully entitled. Id. at 652. 
Although the Baird opinion cited approvingly to both Evans 
and Standefer, see id., it did not address directly the "for or 
because of any official act" language--doubtless because the 
conflict of interest statute at issue contained no such lan-
guage.

 Given that the "for or because of any official act" language 
in s 201(c)(1)(A) means what it says, the jury instructions 
invited the jury to convict on materially less evidence than 
the statute demands--evidence of gifts driven simply by 
Espy's official position. The difference may not seem very 
great, for whenever a donor has matters actually or potential-
ly pending before his donee, gifts motivated by the latter's 
position will usually also be motivated by a desire to reward 
or elicit favorable official action. But the terms of the statute 
require a finding that the gifts were motivated by more than 
merely the giver's desire to ingratiate himself with the official 
generally, or to celebrate the latter's status.

 In his effort to salvage the instructions, the independent 
counsel points to other portions of the charge in which the 
judge simply repeated the terms of the statute or the indict-
ment verbatim, e.g., by reciting the words "for or because of 
an official act." These recitations could not possibly, howev-
er, have overcome the broader message. Thus the charge 
failed to give the jury an adequate understanding of the 
issues, see United States v. DeFries, 129 F.3d 1293, 1304 
(D.C. Cir. 1997), and the error cannot be called technical or 
harmless, see United States v. Lemire, 720 F.2d 1327, 1339 
(D.C. Cir. 1983). We reverse and remand for a new trial on 
Count I.6

__________
 6 We reject Sun-Diamond's contention that the gratuity statute is 
unconstitutionally vague as applied to its conduct. United States v. 


 At the same time, we reject Sun-Diamond's broad attack 
on the indictment. Again Campbell controls. Campbell ar-
gued, much as Sun-Diamond does here, that the jury should 
have been required "to find that the gratuity was conferred 
with 'specific knowledge' of 'a definite official action for which 
compensation was intended.' " 684 F.2d at 149. We rejected 
that argument, holding that it was sufficient for the jury to 
find that the trucking company had provided free services to 
Campbell because it believed the judge had been, or would 
later be, "generally lenient" in dealing with the company's 
voluminous traffic citations. Id. at 149-50. The government, 
we held, was not required to show that any particular free 
service provided to Campbell was earmarked for any particu-
lar ticket or tickets; leniency in a multitude of specific acts 
was enough. That an official has an abundance of relevant 
matters on his plate should not insulate him or his benefac-
tors from the gratuity statute--as long as the jury is required 
to find the requisite intent to reward past favorable acts or to 
make future ones more likely.

The Fraudulent Scheme

 Sun-Diamond was found guilty on Counts III and IV of 
committing wire fraud in violation of 18 U.S.C. ss 1343 & 
1346, and on Counts V through IX of violating the Federal 
Election Campaign Act, 2 U.S.C. ss 441b(a) & 441f 
("FECA"). Both sets of convictions flow from a scheme of 
Richard Douglas and James H. Lake to help repay the debts 
of the failed congressional campaign of Mike Espy's brother 
Henry. The following facts about the scheme come from the 
testimony of Lake, who was granted immunity by prosecutors 
in exchange for his cooperation.

 Lake was one of the founding partners of a Washington-
based firm, Robinson Lake Sawyer & Miller ("RLSM"), which 
handled communications and public relations matters for 

__________

Campbell, 684 F.2d 141, 150 n.17 (D.C. Cir. 1982); cf. United States 
v. Brewster, 506 F.2d 62, 76-78 (D.C. Cir. 1974).


Sun-Diamond.7 Sun-Diamond retained RLSM for a fee of 
$20,000 a month; Douglas oversaw Sun-Diamond's dealings 
with RLSM and maintained his own office there. RLSM was 
a wholly-owned subsidiary of Bozell Worldwide, Inc. ("Bo-
zell").

 After Mike Espy became Secretary of Agriculture, Henry 
Espy unsuccessfully pursued election to his brother's vacant 
seat in Congress, building up a sizable campaign debt in the 
process. In February 1994 Douglas left a telephone message 
at Lake's office--a crucial act for jurisdiction over one of the 
wire fraud counts. When Lake contacted Douglas, he 
learned that Secretary Espy had asked Douglas for help in 
retiring his brother's campaign debt. Lake immediately of-
fered to donate $1,000, the maximum permissible individual 
contribution. Douglas replied that he had to raise at least 
$5,000 fast, and that he needed Lake's help. He then pro-
posed a way around the campaign finance restrictions. If 
Lake would get five RLSM employees (including Lake him-
self) to write a check for $1,000 each, Douglas would find a 
way for Sun-Diamond to reimburse them all. Lake knew the 
scheme was illegal--corporations are forbidden to make con-
tributions "in connection with any election" for Congress, 2 
U.S.C. s 441b(a), and no one may make a campaign contribu-
tion in the name of another person, 2 U.S.C. s 441f--but 
agreed to participate anyway. Lake testified that no one else 
at RLSM or Bozell knew about the plan.

 Lake wrote a $1,000 check in his own name and then 
approached the four RLSM employees identified by Douglas. 
Three of them agreed to pay up. (A fourth--presumably 
suspicious about the notion of a reimbursable campaign con-
tribution--declined.) Lake then passed the checks worth 

__________
 7 At certain points in the record this firm is referred to by 
somewhat different names, such as "RLLM/SMG" (Robinson, Lake, 
Lerer, Montgomery/Sawyer, Miller Group). For simplicity we will 
refer to Lake's partnership as RLSM throughout.


$4,000 to Douglas, who deposited them in a "Henry Espy for 
Congress" account he had opened.

 As the vehicle for reimbursement, Douglas settled on the 
Joint Center Dinner, an annual benefit for which RLSM and 
Lake had in the past routinely bought tickets on Sun-
Diamond's behalf. Lake's staff prepared an internal RLSM 
document authorizing reimbursement to Lake for his sup-
posed purchase of tickets to the dinner in the amount of 
$5,000 (even though he had raised only $4,000 for Henry 
Espy). The same document became part of the monthly 
invoice sent to Sun-Diamond, billing the client $5,000 for the 
fictitious dinner attendance on top of its $20,000 monthly 
retainer and other expenses. Lake received a $5,000 reim-
bursement check from Bozell, which he cashed and used to 
pay back the three other individual contributors (apparently 
pocketing the extra $1,000 for himself). Douglas, as part of 
his normal duties at Sun-Diamond, approved the payment to 
RLSM, which eventually went through. The net result: a 
$5,000 expenditure by Sun-Diamond, $4,000 of which went 
into Henry Espy's campaign coffers and $1,000 into James H. 
Lake's pocket.8 The independent counsel charged that the 
scheme worked a fraud on Bozell and RLSM, depriving the 
former (albeit temporarily) of $5,000, and depriving the latter 
of the "honest services" of its agent Lake under 18 U.S.C. 
s 1346. The jury convicted, evidently convinced that at least 
one such deprivation occurred. The jury also found Sun-
Diamond guilty of making illegal campaign contributions in 
violation of FECA, 2 U.S.C. ss 441b(a) & 441f.

 As a threshold matter, Sun-Diamond raises a challenge 
which it says goes equally to the wire fraud and FECA 
counts. Richard Douglas's campaign contribution scheme 
cannot be attributed to it, Sun-Diamond argues, because 
Douglas was not acting with an intent to benefit the corpora-

__________
 8 In October 1995 RLSM terminated its relationship with Sun-
Diamond and returned the $5,000 payment.


tion. It is true, as the district court instructed the jury in 
this case, that an agent's acts will not be imputed to the 
principal in a criminal case unless the agent acts with the 
intent to benefit the principal.9 Here, Sun-Diamond says, 
Douglas's scheme was designed to--and did in fact--defraud 
his employer, not benefit it. In this circumstance, it strenu-
ously argues, there can be no imputation: "[T]o establish 
precedent holding a principal criminally liable for the acts of 
an agent who defrauds and deceives the principal while 
pursuing matters within his self-interest merely because the 
agent's conduct may provide some incidental benefit to the 
principal serves to punish innocent principals with no counter-
vailing policy justifications." Appellant's Reply Br. at 16 n.9.

 This argument has considerable intuitive appeal--Sun-
Diamond does look more like a victim than a perpetrator, at 
least on the fraud charges. The facts in the record, howev-
er--that Douglas hid the illegal contribution scheme from 
others at the company and used company funds to accomplish 
it--do not preclude a valid finding that he undertook the 
scheme to benefit Sun-Diamond. Part of Douglas's job was 
to cultivate his, and Sun-Diamond's, relationship with Secre-
tary Espy. By responding to the Secretary's request to help 
his brother, Douglas may have been acting out of pure 
friendship, but the jury was entitled to conclude that he was 
acting instead, or also, with an intent (however befuddled) to 
further the interests of his employer. The scheme came at 
some cost to Sun-Diamond but it also promised some benefit. 
See, e.g., United States v. Automated Medical Laboratories, 
Inc., 770 F.2d 399, 406-07 (4th Cir. 1985) (agent's conduct 
which is actually or potentially detrimental to corporation 
may nonetheless be imputed to corporation in criminal case if 

__________
 9 In a civil case, there may be no need to show that the agent 
acted to further the principal's interests--a showing of "apparent 
authority" is often enough. See American Society of Mechanical 
Engineers v. Hydrolevel Corp., 456 U.S. 556, 573-74 (1982) (private 
antitrust action).


motivated at least in part by intent to benefit it); cf. Local 
1814, International Longshoremen's Association, AFL-CIO 
v. NLRB, 735 F.2d 1384, 1395 (D.C. Cir. 1984) ("[T]he acts of 
an agent motivated partly by self-interest--even where self-
interest is the predominant motive--lie within the scope of 
employment so long as the agent is actuated by the princi-
pal's business purposes 'to any appreciable extent.' ") (quoting 
Restatement (Second) of Agency s 236 & comment b (1957)). 
Where there is adequate evidence for imputation (as here), 
the only thing that keeps deceived corporations from being 
indicted for the acts of their employee-deceivers is not some 
fixed rule of law or logic but simply the sound exercise of 
prosecutorial discretion.

 And the answer to Sun-Diamond's claim of the absence of 
any "countervailing policy justification" is simply the justifica-
tion usually offered in support of holding corporate principals 
liable for the illegal acts of their agents: to increase incen-
tives for corporations to monitor and prevent illegal employee 
conduct. See Kevin B. Huff, Note, The Role of Corporate 
Compliance Programs in Determining Corporate Criminal 
Liability: A Suggested Approach, 96 Colum. L. Rev. 1252, 
1263 & n.49 (1996). One might well question this justifica-
tion--and scholars have. See, e.g., Daniel R. Fischel and 
Alan O. Sykes, Corporate Crime, 25 J. Legal Stud. 319 (1996) 
(arguing that corporate criminal liability spurs excessive mon-
itoring and litigation costs and should be discarded in favor of 
civil liability); Jennifer Arlen, The Potentially Perverse Ef-
fects of Corporate Criminal Liability, 23 J. Legal Stud. 833 
(1994) (arguing that strict corporate liability may deter corpo-
rate monitoring by making criminal exposure more likely, so 
that its imposition may increase the likelihood of crime). 
Moreover, the justification may be at its weakest in cases like 
this one, where the offending employee breaches a duty of 
honesty to the very corporation whose goals he aims to 
advance. In any event, Sun-Diamond's argument here, what-
ever its merit as an issue of policy, has no real grounding in 
the relevant statutes. And Sun-Diamond does not invoke the 
Constitution, which in any event would require either an 
overruling of the Supreme Court's rejection of a due process 


attack on corporate liability, New York Cent. & Hudson River 
R.R. Co. v. United States, 212 U.S. 481 (1909), or the develop-
ment of some new theory.

 Sun-Diamond also raises a narrower objection concerning 
imputation, one which goes only to the fraud counts. To the 
extent Douglas's conduct is to be imputed to his employer, 
argues Sun-Diamond, then so must Lake's be imputed to his 
employers (RLSM and Bozell). Both men occupied high-level 
management positions in their respective firms, and both 
men's firms sought to establish and maintain good relations 
with Secretary Espy. If Douglas's knowledge can be imput-
ed to Sun-Diamond to hold it responsible for Douglas's acts, 
then Lake's must be imputed to his employers, RLSM and 
Bozell, and they cannot be victims.

 Even assuming the evidence showed the balance of private 
and corporate purpose in Douglas's and Lake's motivation to 
be identical, Sun-Diamond's argument rests on a faulty as-
sumption--that the imputation rules must be the same on 
both the perpetrator and victim sides. They need not be, and 
indeed are not. Imputation is a legal fiction designed to 
assist in the allocation of liability, not a literal description of 
the state of a principal's knowledge. The law imputes the 
wrongdoer's conduct to the corporation in order to encourage 
monitoring, but it is not at all clear that imputation on the 
other side of the equation would be useful in eliciting addi-
tional caution on the part of would-be fraud victims. A rule 
that makes victim wariness a condition of criminally punish-
ing the perpetrator--unlike, say, a rule of contributory negli-
gence in tort--might not inspire much extra precaution in 
potential victims. However much they may benefit from the 
criminalization of fraud generally, potential victims (who have 
many incentives to avoid being gulled, independent of the 
criminal law) seem unlikely to step up their precautions just 
to increase the ex ante chances that their deceivers will face 
criminal sanctions--or so Congress could reasonably con-
clude. Thus, when an individual is swindled, the offender 


does not escape mail or wire fraud liability just because the 
victim was unwary, or even "gullible." See United States v. 
Brien, 617 F.2d 299, 311 (1st Cir. 1980). Indeed, Congress's 
adoption of 18 U.S.C. s 1346, specifying that the term 
"scheme or artifice to defraud," as used in various federal 
criminal fraud statutes, should include schemes to deprive a 
principal "of the intangible right of honest services," is hard 
to square with an imputation rule on the victim side as broad 
as the one governing corporate criminal responsibility.

 We pause briefly over a final threshold issue before ad-
dressing the core of Sun-Diamond's challenge to the fraud 
convictions. The wire fraud statute forbids the use of the 
interstate telephone system "for the purpose of executing" a 
scheme or artifice to defraud. 18 U.S.C. s 1343. Sun-
Diamond says the telephone message left by Douglas for 
Lake preceded their joint concoction of the campaign contri-
bution scheme and thus could not, as a matter of law, have 
furthered the scheme.10 There was, however, ample evidence 
from which the jury could find that Douglas already had some 
sort of fraudulent plan in mind when he placed the initial call 
and left the message. In other words, the jury could have 
found that Douglas used the telephone system "prior to, and 
as one step toward, the receipt of the fruits of the fraud," 
Kann v. United States, 323 U.S. 88, 94 (1944), placing the 
case within the coverage of s 1343.

 Sun-Diamond's core challenge to the wire fraud counts 
raises more serious concerns. The district court charged the 
jury on two alternative routes to fraud liability. It could 
convict, said the court, if it found "that Sun-Diamond Grow-
ers of California devised a scheme or artifice to defraud with 
one or both [of] the two following objectives. One, to obtain 
even temporarily $5,000 from Bozell, Inc. by means of false 
pretense and representations in order to make an illegal 
corporate campaign contribution to Henry Espy for Congress 
Committee. Two, to deprive Bozell, Inc. and [RLSM] of the 
honest, conscientious, faithful, loyal, disinterested and unbi-

__________
 10 This challenge goes only to Count III. The wire communication 
underlying Count IV was the electronic transmission of the $5,000 
billable expense report from RLSM to Bozell.


ased services of its employee, James Lake." Because the 
jury charge was phrased in the disjunctive we must examine 
the legal sufficiency of each basis for liability, to ensure that 
the jury did not convict on a legally impermissible ground. 
See Griffin v. United States, 502 U.S. 46, 59 (1991) (general 
verdict based on alternative grounds of liability will be upheld 
as long as both grounds are legally adequate, even if one is 
factually inadequate).

 As for the first possible objective, we admit that it is not 
immediately obvious how the contribution scheme could have 
been designed to deprive Bozell even temporarily of its 
money or property. Sun-Diamond, through Douglas, caused 
Bozell to make a routine advance of $5,000 with every expec-
tation that Sun-Diamond would provide prompt reimburse-
ment, and in fact it reimbursed the expense promptly and in 
full. As the district court correctly noted in the sentencing 
phase, Bozell was deprived only of the time value of the sum 
advanced, a deprivation it surely considered negligible judg-
ing from the routine and informal nature of the transaction.

 In a case involving fraudulently obtained consumer credit, 
however, we held that where a defendant makes "material 
misrepresentations designed to induce an extension of credit 
that would not otherwise be made, the jury [may] reasonably 
infer intent to defraud," even if the borrower intended in 
good faith to repay the loan. United States v. Alston, 609 
F.2d 531, 538 (D.C. Cir. 1979). Moreover, other courts have 
held that actual repayment is no defense to a charge of 
fraudulently obtaining a loan, presumably because a loan 
obtained by fraud subjects the lender to a greater risk of loss 
than it would have voluntarily borne were it fully informed. 
United States v. Scott, 701 F.2d 1340, 1346-48 (11th Cir. 
1983); United States v. Sindona, 636 F.2d 792, 800 (2d Cir. 
1980); see also United States v. Hollis, 971 F.2d 1441, 1452-
53 (10th Cir. 1992) (repayment not a defense to bank fraud 
under 18 U.S.C. s 1344); United States v. Allen, 76 F.3d 
1348, 1358-59 (5th Cir. 1996) (bank was defrauded, at least 
temporarily, when cashier's checks were fraudulently drawn 


on bank's account, even though bank was reimbursed in full 
by holding company at end of month). Notably, to the extent 
repayment in those cases included interest they did not even 
feature the time-value deprivation that is present here. 
Moreover, although the misrepresentation here did not go to 
the likelihood of the advance being repaid, it was nonetheless 
material: had Bozell known that the $5,000 was being used to 
launder an illegal campaign contribution rather than to re-
serve a table at a charitable dinner, it would not have 
authorized the advance. Just as deceitful assurances of legal-
ity in a conventional loan expose the lender to costly legal 
entanglements (quite apart from risks of non-repayment), so 
too did the concealment here.11

 The second alternative ground of liability was that Sun-
Diamond defrauded RLSM of the honest services of its agent, 
James H. Lake, in violation of 18 U.S.C. s 1346. Congress 
enacted that provision in response to the Supreme Court's 
decision in McNally v. United States, 483 U.S. 350 (1987), 
which held that the mail fraud statute's coverage was limited 
to deprivations of property.12 Section 1346 says simply that 
"[f]or the purposes of this chapter, the term 'scheme or 

__________
 11 Sun-Diamond also offers another reason why Douglas could not 
have intended to defraud Bozell. According to Sun-Diamond, 
Douglas anticipated that Sun-Diamond would reimburse Lake di-
rectly, or at least that Lake's employer would await payment from 
Sun-Diamond before reimbursing Lake, thus avoiding even a tem-
porary deprivation. (In fact Sun-Diamond contends, implausibly, 
that there was no evidence from which a jury could infer that 
Douglas even knew of Bozell's existence.) Given Douglas's experi-
ence with Sun-Diamond/RLSM billing practices, however, he could 
reasonably have foreseen the possibility that Lake would seek an 
advance from his employer or its parent company at the time he 
hatched the scheme.

 12 The elements required for conviction under s 1341 (mail fraud) 
and s 1343 (wire fraud) are identical except for the means of 


artifice to defraud' includes a scheme or artifice to deprive 
another of the intangible right of honest services." 18 U.S.C. 
s 1346. The "honest services" theory has typically been 
used, both in cases up to McNally and again under s 1346, as 
a tool for prosecuting corrupt public officials who have de-
prived citizens of their right to honest representation. See 
United States v. Paradies, 98 F.3d 1266, 1283 n.30 (11th Cir. 
1996) (collecting cases). But it has also been used, as here, to 
prosecute private citizens who defraud private entities. See, 
e.g., United States v. Lemire, 720 F.2d 1327 (D.C. Cir. 1983); 
United States v. DeFries, 129 F.3d 1293, 1305-06 (D.C. Cir. 
1997); United States v. Jain, 93 F.3d 436 (8th Cir. 1996); 
United States v. Frost, 125 F.3d 346 (6th Cir. 1997); United 
States v. D'Amato, 39 F.3d 1249 (2d Cir. 1994); United States 
v. Cochran, 109 F.3d 660 (10th Cir. 1997); United States v. 
Gray, 96 F.3d 769 (5th Cir. 1996).

 In the private sector context, s 1346 poses special risks. 
Every material act of dishonesty by an employee deprives the 
employer of that worker's "honest services," yet not every 
such act is converted into a federal crime by the mere use of 
the mails or interstate phone system. Aware of the risk that 
federal criminal liability could metastasize, we held in Lemire 
that "not every breach of a fiduciary duty works a criminal 
fraud." Lemire, 720 F.2d at 1335, quoting United States v. 
George, 477 F.2d 508, 512 (7th Cir. 1973). Rather, "[t]here 
must be a failure to disclose something which in the knowl-
edge or contemplation of the employee poses an independent 
business risk to the employer." Id. at 1337.13 Absent rea-
sonably foreseeable economic harm, "[p]roof that the employ-
er simply suffered only the loss of the loyalty and fidelity of 

__________
communication. United States v. Lemire, 720 F.2d 1327, 1334-35 
n.6 (D.C. Cir. 1983).

 13 Lemire was a pre-s 1346 decision, but Congress's evident 
intent in enacting that provision was to revive pre-McNally caselaw, 
at least with respect to the deprivation of honest services. See, e.g., 


the [employee] is insufficient to convict." Frost, 125 F.3d at 
368.

 The independent counsel says that Douglas and Lake's 
fraudulent scheme threatened serious economic harm to 
RLSM, because disclosure of a name partner's fraudulent use 
of RLSM's offices to funnel illegal contributions to a political 
candidate would severely damage the firm's reputation. The 
district court agreed, 964 F. Supp. at 493-94. As Lake 
testified, the chief assets of a public relations firm are its 
legitimacy and credibility in the eyes of current and potential 
clients. Both stood to be undermined by Douglas and Lake's 
actions. There is no doubt that Douglas and Lake could have 
foreseen that their actions would cause substantial economic 
harm to RLSM once word of the scheme got out.

 Sun-Diamond, however, says this is not enough. It con-
tends that in the private sector context s 1346 and Lemire 
demand a showing that the defendant intended to cause 
economic harm to his victim, not merely that he could have 
reasonably foreseen such harm. Since the economic harm 
identified by the independent counsel flows exclusively from 
disclosure of the contribution scheme, and since Douglas 
surely did not intend for his scheme to be revealed (except 
possibly to Mike Espy, so that the Secretary's gratitude could 
be properly directed), Sun-Diamond reasons that it is free 
from liability under s 1346. In response to this argument, it 
will not do to cite "the presumption, common to the criminal 
and civil law, that a person intends the natural and foresee-
able consequences of his voluntary actions." Personnel Ad-
ministrator of Mass. v. Feeney, 442 U.S. 256, 278 (1979). 
Applying the presumption to the actual detection and revela-
tion of an illegal scheme would threaten to turn the word 

__________

Frost, 125 F.3d at 364 ("We therefore hold that s 1346 has restored 
the mail fraud statute to its pre-McNally scope, according to 
previous opinions interpreting the intangible right to honest ser-
vices.").


"intent" inside out. Is a criminal who foresees his own 
capture thereby said to intend it? If so, are especially elusive 
criminals, whose apprehension is ex ante relatively unlikely, 
in a better legal position than clumsy ones?

 We need not address these questions, because we disagree 
with Sun-Diamond's contention that s 1346 and Lemire re-
quire the government to show that the defendant intended to 
cause economic harm to his victim. Sun-Diamond appears to 
confuse the requirement of an intent to defraud (amply met 
here, since the crux of the scheme was the submission of a 
fictitious expense report to RLSM) with a requirement of 
intent to cause economic harm. But Lemire did not go so far 
as to say that economic harm must be part of the defendant's 
intent in a private-sector "honest services" case--only that 
economic harm be within the defendant's reasonable contem-
plation. Although Lemire dealt with failure to disclose a 
conflict of interest rather than with an active scheme to 
defraud, its treatment of the foreseeability issue governs this 
case:

 So long as the jury finds the non-disclosure furthers a 
 scheme to abuse the trust of an employer in a manner 
 that makes an identifiable harm to him, apart from the 
 breach itself, reasonably foreseeable, it may convict the 
 employee of wire fraud. The crucial determination must 
 be whether the jury could infer that the defendant might 
 reasonably have contemplated some concrete business 
 harm to his employer ...

Lemire, 720 F.2d at 1337 (emphasis added); see also United 
States v. Barta, 635 F.2d 999, 1005-06 n.14 (2d Cir. 1980) 
(relied on in Lemire). As we reaffirmed recently, "Lemire 
held that breaches of fiduciary duty are criminally fraudulent 
only when 'accompanied by a misrepresentation or non-
disclosure that is intended or is contemplated to deprive the 
person to whom the duty is owed of some legally significant 
benefit.' " DeFries, 129 F.3d at 1306, quoting Lemire, 720 


F.2d at 1335 (emphasis added). See also Frost, 125 F.3d at 
368 (holding that, in cases where employee is charged with 
defrauding private employer of his own honest services, "[t]he 
prosecution must prove that the employee intended to breach 
a fiduciary duty, and that the employee foresaw or reasonably 
should have foreseen that his employer might suffer an 
economic harm as a result of the breach.") (emphasis added); 
D'Amato, 39 F.3d at 1257 (pre-s 1346 case holding that 
misrepresentations amounting only to a deceit "must be 
coupled with a contemplated harm to the victim").

 We therefore affirm the convictions for wire fraud on 
Counts III and IV.14

 SentencingIssues

 Sun-Diamond challenges two aspects of its sentence: the 
district court's upward departure based on Espy's position as 
Secretary of Agriculture, and the imposition of reporting 
requirements on the member cooperatives. We agree with 
Sun-Diamond and reverse on both points.

 District courts may make upward departures from the 
Sentencing Guidelines only if "there exists an aggravating ... 
circumstance of a kind, or to a degree, not adequately taken 
into consideration by the Sentencing Commission in formulat-
ing the guidelines." 18 U.S.C. s 3553(b); U.S. Sentencing 
Guidelines Manual ("U.S.S.G.") s 5K2.0. We review district 
court determinations that a given factor is present in a 
particular case to a degree not adequately considered by the 
Commission only for abuse of discretion, because "[d]istrict 
courts have an institutional advantage over appellate courts in 
making these sorts of determinations, especially as they see 
so many more Guidelines cases than appellate courts do." 
Koon v. United States, 116 S. Ct. 2035, 2047 (1996). But 
whether a given factor could ever be a permissible basis for 
departure is a question of law which we address de novo. Id. 
Here, the issue is in a sense one of degree--how much 
authority and status might elevate a position above even the 

__________
 14 Sun-Diamond does not challenge the adequacy of the jury 
charge on the "honest services" theory of liability under ss 1343 & 
1346.


rank for which the Guidelines prescribe an eight-level hike--
but it also poses the onetime issue of whether cabinet-level 
officers enjoy such lofty status, hardly the sort of fact-
intensive issue calling for extreme deference.

 The guideline applicable to violations of the gratuity statute 
prescribes a base offense level of 7. U.S.S.G. s 2C1.2. It 
calls for a two-level increase if the offense involved more than 
one gratuity, and an eight-level increase

 [i]f the gratuity was given, or to be given, to an elected 
 official or any official holding a high-level decision-
 making or sensitive position.

Id. The district court imposed both the two-level and the 
eight-level increase, bringing the offense level to 17. It then 
appended an additional two-level increase, finding that the 
Guidelines did not adequately take into account Espy's posi-
tion as a cabinet-level official. This increase in offense level 
from 17 to 19 doubled Sun-Diamond's base fine from $250,000 
to $500,000. U.S.S.G. s 8C2.4. The court then assigned 
Sun-Diamond a "culpability score" of 9 out of a possible 10, 
see id. s 8C2.5, a determination Sun-Diamond does not 
challenge here. This culpability score dictated a minimum 
multiplier of 1.8 and a maximum of 3.6, id. s 8C2.6, leading 
to an applicable fine range of $900,000 to $1,800,000, from 
which the court chose a figure in the "upper range"-- 
$1,500,000.

 In support of departing upward on account of the high level 
of the donee's position, the district court reasoned:

 The President has but one cabinet with select members 
 who the court deems to be on a higher level with regard 
 to the type of responsibility which is otherwise contem-
 plated by the guidelines, and the Secretary of Agricul-
 ture, in fact, is tenth in the order of succession to the 
 Office of the Presidency. That is not an insignificant 
 fact, and as unlikely as it may be that the Secretary of 
 Agriculture would assume the Presidency of the United 
 States because circumstances would not normally present 
 that opportunity, nevertheless, there is a reason for 


 creating a pecking order to the position which many 
 believe is the position of the most powerful person on the 
 face of the earth.

 In any event, the court [notes] for example that Secre-
 tary Espy administered a budget of $65 and one half 
 billion, this figure represents 4.3 percent of the total 
 federal budget. He's responsible for a great work force 
 and makes decisions frequently that have a significant 
 and broad and wide-ranging effect on the American 
 population, and some might believe on the population of 
 ... other parts of the world.

As the Secretary of Agriculture obviously holds a "high-level 
decision-making or sensitive position," it is clear that the 
district court rested its departure not on a finding that 
cabinet-level status was the kind of factor the Sentencing 
Commission failed to consider in formulating s 2C1.2, but on 
a belief that his position is so high-level that it represents an 
aggravating circumstance present to a degree not taken into 
account by the Commission.

 This conclusion is at odds with the Sentencing Commis-
sion's explanation of s 2C1.2.15 The Application Notes ex-
plain that " 'Official holding a high-level decision-making or 
sensitive position' includes, for example, prosecuting attor-
neys, judges, agency administrators, supervisory law enforce-
ment officers, and other governmental officials with similar 
levels of responsibility." U.S.S.G. s 2C1.2, App. Note 1. We 
do not think the Secretary of Agriculture holds a position that 
in level or sensitivity differs in any material degree from 
persons the Application Note explicitly says were within the 
Commission's contemplation.

 Since the Secretary administers an agency, a straightfor-
ward reading of the Application Note strongly suggests that 
he falls within the "agency administrator" category. The 
independent counsel says that this term was meant to refer to 
lower-level program administrators, of which it says there are 

__________
 15 "In determining whether a circumstance was adequately taken 
into consideration the court shall consider only the sentencing 
guidelines, policy statements, and official commentary of the Sen-
tencing Commission." 18 U.S.C. s 3553(b).


85 or so within USDA alone, Appellee's Br. at 43 n.15, but 
never explains why we should assume the Sentencing Com-
mission had such a limited category in mind. The Application 
Note expressly lists judges as the sort of high-level officials 
for which the eight-level departure is appropriate. Perhaps 
our perspective is skewed, but offering a gratuity to a life-
tenured federal judge seems to us at least as culpable as 
offering one to a cabinet secretary--indeed, we suspect most 
citizens would consider the former a more troubling breach of 
public trust than the latter. To permit a two-level departure 
for the latter, when such a departure is specifically precluded 
for the former, appears illogical.

 Nor is the district court's decision rescued by its observa-
tions about presidential succession. The Guideline includes 
elected officials without apparent regard to the loftiness or 
sensitivity of their positions, and the Application Note says 
nothing to suggest variation within the elected-official catego-
ry. Thus it appears to sweep in officials ranging in rank from 
Representative to President. Even assuming that a case 
involving the President might present a sui generis situation 
warranting departure, Sun-Diamond points out that the 
Speaker of the House is second in line to the presidency after 
the Vice President, 3 U.S.C. s 19, and yet is also presumably 
taken into account by s 2C1.2 as an "elected official." The 
independent counsel responds that "perhaps the Sentencing 
Commission did not take into consideration the position and 
power of the Speaker of the House when it drafted the 
bribery and gratuity guidelines." Appellee's Br. at 45 n.16. 
Conceivably, but more likely the Commission meant, as it 
said, to lump all federal elected officials together, in contrast 
with other officials whose rank was seen to vary enough to 
require consideration of levels of responsibility. Similarly, 
the Attorney General--seventh in line to the presidency--
seems to fit within the Application Note's "supervisory law 
enforcement officers" category. Though we need not, and do 
not, decide today the status of these officials with respect to 
s 2C1.2, their seeming inclusion argues strongly against the 
idea that the Sentencing Commission failed to take adequate-


ly into account the degree of responsibility of an official 
further down the line of presidential succession.

 Moreover, the district court's approach makes one wonder 
how far one must go down the line of succession before one 
finally reaches the heartland of s 2C1.2. The Secretary of 
Agriculture is in fact ninth in the line of succession, 3 U.S.C. 
s 19, not tenth as the district court stated.16 This makes his 
connection to ultimate power just as attenuated as that of the 
anti-hero of "Kind Hearts and Coronets," who had to murder 
eight Alec Guinnesses to become Duke of Chalfont. What of 
the Secretary of Health and Human Services, at number 
twelve in the queue, id., or the Secretary of Veterans Affairs, 
at seventeen, id.? Of course, questions of line-drawing are 
often difficult, and in the sentencing arena such questions are 
normally best resolved by the district courts on a case-by-
case basis. Here, however, the factor invoked in support of 
departure--cabinet-level status--is not one that the district 
courts enjoy any comparative advantage in assessing, unlike 
such fine-grained, fact-bound circumstances as extreme psy-
chological injury, see U.S.S.G. s 5K2.3, or victim misconduct, 
see id. s 5K2.10. We conclude that the two-level upward 
departure was impermissible.

 Sun-Diamond also challenges the imposition of reporting 
requirements on its member cooperatives. The district court 
declared, as a condition of probation, that "Sun-Diamond and 
its members [sic] cooperatives shall provide quarterly submis-
sions to the probation officer reporting all of the organiza-
tion's expenditures related to all federal employees, office 
holders or candidates for federal office [including] any expen-
diture related [to] the procurement of any federal govern-
ment contract, creation of a federal law or regulation, or the 

__________
 16 The current Secretary of Agriculture, however, is in practical 
effect eighth in line, since Secretary of State Madeleine Albright, 
having been born abroad, is ineligible. See U.S. Const. art. II, s 1, 
cl. 5.


development of any federal policy." These requirements 
were to continue in force for five years.

 We recognize that the sentencing judge has broad discre-
tion to establish conditions of probation. Lemire, 720 F.2d at 
1352. But we know of no precedent for the imposition of 
probationary conditions on entities who are not defendants, 
nor even agents of defendants--the latter category proble-
matic in its own right, but much more plausibly legitimate 
than the present case. Although the independent counsel 
paints Sun-Diamond as a mere alter ego of the cooperatives 
that own it, we are not persuaded. The member cooperatives 
have their own corporate identities, boards of directors, em-
ployees, assets and liabilities, as does Sun-Diamond. Their 
power to control Sun-Diamond seems no greater than the 
power of ordinary shareholders to control a corporation.

 As the Ninth Circuit has explained, imposition of a condi-
tion on a third party exposes the defendant to revocation of 
probation for "violations" by persons not under his control. 
United States v. Sweeney, 914 F.2d 1260, 1263 (9th Cir. 1990). 
Cf. Fiore v. United States, 696 F.2d 205, 208-09 (2d Cir. 1982) 
(reversing condition of probation imposed on defendant who 
was president, secretary, sole stockholder and only full-time 
employee of corporate co-defendant, which had required him 
to pay fine imposed on corporation). And 18 U.S.C. s 3563, 
which enumerates mandatory and discretionary conditions of 
probation, specifies in every one of them the "defendant" as 
the person to be burdened. See Sweeney, 914 F.2d at 1263. 
As the member cooperatives were not made defendants and 
given an opportunity to be heard, they may not now be 
subjected to probation.

 

 * * *

 We reverse and remand for new trial on Count I; we 
affirm the convictions on Counts III through IX; and we 
vacate Sun-Diamond's sentence and remand for further pro-
ceedings consistent with this opinion.

 So ordered.